JDN

1   WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Randee R. Vensor,                       No.   CV-12-01780-PHX-SPL (JFM)

              Plaintiff,
10

11  vs.                                     **ORDER**

12  Central Arizona Correctional Facility, et
    al.,
13
              Defendants.
14

15          Plaintiff Randy R. Vensor brought this pro se civil rights actions under 42 U.S.C.

16  § 1983 against Arizona Department of Corrections (ADC) General Counsel Karen

17  Klausner and three employees at the Central Arizona Correctional Facility (CACF):[1]

18  Nurse Tanya Schell, and Correctional Officers (CO) Patrick Cervantes and Robert

19  Velasquez (Doc. 7).   Defendants have filed three separate Motions for Summary

20  Judgment (Docs. 113, 118-119).   Vensor opposes all motions and cross-moves for

21  summary judgment (Docs. 131-133).

22          The Court will deny Vensor's cross-motions for summary judgment, grant

23  Defendants' motions, and terminate the action.

24  **I.     Background**

25          Vensor's claims arose during his confinement at the CACF facility in Florence,

26  Arizona (Doc. 7).  In Count I of his First Amended Complaint, he states that in December

27

28  _____
    [1] CACF is a private prison operated by the GEO Group pursuant to a contract with
    the ADC (*see* Doc. 17 at 1-2).

2010, he was seen by Dr. Haleem for a large tumor on the right side of his ribs that caused significant pain (*id.* at 3).  Vensor requested the tumor be removed, but Dr. Haleem told him that the Medical Review Committee (MRC) and Klausner "denied and prolonged" the surgery (*id.*).  After he filed numerous health requests, Vensor was finally sent to the Maricopa Medical Center (MMC) in March 2011, at which time an oncologist and bone specialist examined him and recommended immediate removal of the tumor (*id.*).  According to Vensor, he was not sent to the hospital for another seven months, and only after a prisoner advocate threatened Klausner with legal action (*id.*).  Vensor had surgery on October 5, 2011; however, by that time, the tumor had attached to his ribs, which caused serious complications (*id.*).  Vensor alleged that Klausner was deliberately indifferent to his serous medical needs in violation of the Eighth Amendment when she failed to take action to ensure timely, necessary surgery (*id.*).

In Count II, Vensor alleged that when Velasquez and Cervantes transported him to the hospital on August 30, 2011, the air conditioning was not working and when Vensor informed them, they failed to remedy the problem (*id.* at 4).  Vensor claimed that it was 114 degrees that day; the transport van became so hot that he could not breathe or see correctly; and when he exited the van upon arrival back at the prison, he collapsed and was taken to the medical unit (*id.*).  He stated that the nurse informed him he had suffered severe heat stroke (*id.*). Vensor alleged that Velasquez and Cervantes' actions constituted a threat to Vensor's safety in violation of the Eighth Amendment (*id.*).

And in Count III, Vensor asserted that in December 2010, when he initially requested surgery to remove the tumor near his ribs, Dr. Haleem informed him that surgery had to be approved by Schell and the MRC (*id.* at 5).  Vensor stated that thereafter, he was told his surgery requests had been denied by Schell and the MRC on the ground that the tumor was not life threatening, despite recommendations for surgery (*id.*).  As stated, Vensor waited seven months before surgery was finally approved after intervention by an outside advocate (*id.*).  Vensor alleged that Schell's role in failing to timely approve surgery constituted deliberate indifference to his serious medical needs in

1   violation of the Eighth Amendment (*id.*).

2        The parties now move for summary judgment.  Schell filed her separate Motion
3   for Summary Judgment (Doc. 113), followed by Velasquez and Cervantes' Motion for
4   Summary Judgment (Doc. 118), and Klausner's Motion for Summary Judgment (Doc.
5   119).  In his separate response to each motion, Vensor moves for "counter summary
6   judgment" (Docs. 131-133).

7   **II.    Vensor's Motions for Counter Summary Judgment**

8        The Court initially set the dispositive-motions deadline for September 11, 2013
9   (Doc. 23).  After granting two of Defendants' requests for an extension, the final
10  dispositive-motions deadline was January 17, 2014 (Doc. 112).

11       Vensor's requests for counter summary judgment are set forth in his response
12  filings, which were all filed on February 14, 2014 (Docs. 131-133).  Vensor did not seek
13  an extension or move for leave to file summary judgment motions after the January 17,
14  2014 deadline.  As such, to the extent that Vensor cross-moves for summary judgment,
15  his counter motions are untimely and will be denied.  Vensor's response filings will be
16  considered, however, as opposition to Defendants' motions.

17  **III.   Summary Judgment Standard**

18       A court must grant summary judgment "if the movant shows that there is no
19  genuine dispute as to any material fact and the movant is entitled to judgment as a matter
20  of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23
21  (1986).  The movant bears the initial responsibility of presenting the basis for its motion
22  and identifying those portions of the record, together with affidavits, that it believes
23  demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

24       If the movant fails to carry its initial burden of production, the nonmovant need
25  not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d
26  1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the
27  burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that
28  the fact in contention is material, i.e., a fact that might affect the outcome of the suit

3

under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255.

**IV.    Velasquez and Cervantes' Motion for Summary Judgment**

**A.    Governing Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. *Morgan*, 465 F.3d at 1045. Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety; however, not every injury that a prisoner sustains while in prison represents a constitutional violation. *Id.* (quotation marks omitted); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted).

To maintain an Eighth Amendment conditions-of-confinement claim, a prisoner must make two showings. First, the prisoner must make an "objective" showing that the alleged deprivation is "sufficiently serious." *Farmer*, 511 U.S. at 834. To be sufficiently serious to form the basis of an Eighth Amendment violation, "a prison official's act or

4

omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.*, citing *Rhodes*, 452 U.S. at 347.  Second, the prisoner must make a "subjective" showing that the prison official acted with a "sufficiently culpable state of mind"; that is, that the defendant acted with deliberate indifference to the prisoner's health or safety.  *Farmer*, 511 U.S. at 834.  To show deliberate indifference, the prisoner must establish that the defendant knew of and disregarded an excessive risk to inmate health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Prison officials may avoid Eighth Amendment liability for the harm suffered by an inmate if they show that: (1) "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) they responded reasonably to the risk.  *Id.* at 844.

**B.   Relevant Facts**

The relevant facts are taken from the parties' separate Statements of Facts (Doc. 117, Velasquez and Cervantes' Statement of Facts (VCSOF); Doc. 133 at 7-10, Vensor's Statement of Facts (VSOF1)), and from Vensor's sworn declaration (Doc. 130).  The Court notes that in support of some of their asserted facts, Velasquez and Cervantes simply cite to "Exhibit A" or "Exhibit B" (*see* VCSOF ¶¶ 1-6).  Exhibits A and B are declarations from CO Christopher Horen and Velasquez (Doc. 117, Exs. A-B).  Defendants fail to cite to the page number or specific paragraph within each declaration that supports each asserted fact.  *See Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (in summary judgment briefing "[g]eneral references without page or line numbers are not sufficiently specific").  Similarly, in response to many of Velasquez and Cervantes' asserted facts, Vensor states that he opposes the asserted fact and cites only to "Exhibit B" or other attachments (*see e.g.* Doc. 133,

5

VSOF1 ¶¶ 1-5). Vensor does not provide any page numbers or specific citations to the portions of his exhibits that support his opposition. Notably, his Exhibit B consists of 28 pages of medical records (Doc. 133 at 26-54).

A party must support an assertion by citing to particular parts of the materials in the record. Fed. R. Civ. P. 56(c)(1)(A); *see* LRCiv 56.1(a) (separate statement of facts must include a reference to the specific admissible portion of the record where the asserted fact finds support). In its summary judgment analysis, the court is "not required to comb the record" to find supporting evidence. *See Carmen v. S.F. United Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001); *see also Orr v. Bank of Am.*, 285 F.3d 764, 775 (9th Cir. 2002) ("'[j]udges need not paw over the files without assistance from the parties'") (quoting *Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir. 1999)). Although neither party strictly adhered to the rules governing summary judgment briefing, the Court has reviewed VCSOF and VSOF1 and the evidence to try to determine the disputed facts and if evidentiary support exists for the respective asserted facts. That said, to the extent the Court may have failed to locate specific supporting evidence, it is due to the parties' insufficient citations or briefing. *See* Fed. R. Civ. P. 56(c)(3) ("[t]he court need consider only the cited materials, but it may consider other materials in the record").

On August 30, 2011, Vensor was transported from the prison to the MMC for an appointment (VCSOF ¶ 2 (in part); Doc. 130, Vensor Decl. ¶ 8). Vensor states that it was 114 degrees that day, the transport to MMC took about an hour, and the air conditioning in the van was not working (Doc. 130, Vensor Decl. ¶¶ 9, 11). He states that he informed Velasquez and Cervantes immediately of the inoperative air conditioning (*id.* ¶ 10). Defendants state that when Vensor complained about being hot, they closed the vents in the front to increase airflow to the back of the van (VCSOF ¶ 4 (in part)).

Vensor states that when they arrived at the MMC, he again informed them that the air conditioning was not working and only hot air was blowing out through the vents in the back (Doc. 130, Vensor Decl. ¶ 12). Vensor felt dizzy and nauseous and had a bad headache (*id.* ¶ 11; VCSOF ¶ 9). Velasquez and Cervantes advised Vensor that he could

get a drink of cold water after his appointment (Doc. 130, Vensor Decl. ¶ 13; VCSOF ¶ 9).  Vensor also told the medical provider that he did not feel well and was sick due to the airflow in the van during transport; the provider recommended that Vensor drink water (Doc. 130, Vensor Decl. ¶ 14 (in part); VCSOF ¶ 10).  Vensor was allowed to drink water from the sink in the bathroom before returning to the prison; the water was not very cold (Doc. 130, Vensor Decl. ¶ 15; VCSOF ¶ 11).

On the return transport, the air flow was warm, Vensor became very ill and dizzy and soaked with sweat, and he had difficulty breathing and seeing clearly (Doc. 130, Vensor Decl. ¶ 16; VCSOF ¶ 12).  He asked the two Defendants to pull over and open the door and given him cool water that Defendants were drinking (VCSOF ¶ 12).  Vensor states that Defendants appeared to mess with some valves for a few seconds but then ignored him (Doc. 130, Vensor Decl. ¶ 17; Doc. 117, Ex. C, Vensor Dep. 110:10-23, Nov. 6, 2011).

When they arrived back at the prison, Vensor tried to get of the van and then blacked out and fell on the pavement (Doc. 130, Vensor Decl. ¶ 18; VCSOF ¶ 14).  He came to about an hour later when he was receiving treatment from Nurse Shaw in the medical unit (Doc. 130, Vensor Decl. ¶ 19; VCSOF ¶ 14).  Nurse Shaw treated Vensor for chest pain, gave him "nitro," and placed him on intravenous fluid (VCSOF ¶ 15).

### C.  Discussion

#### 1. Objective Prong

The initial question in the deliberate-indifference analysis is whether the conditions during Vensor's transport constituted a sufficiently serious deprivation. In making this determination, the Court must consider the "circumstances, nature, and duration" of Vensor's exposure to the conditions.  *See Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005); *Keenan v. Hall*, 83 F.3d 1083, 1089, 1091 (9th Cir. 1996). Allowing a prisoner to be exposed to extreme temperatures may violate the Eighth Amendment.  *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (low cell temperatures at night combined with failure to issue blankets could result in unconstitutional condition of

confinement).   But every case the Court finds concerning exposure to extreme temperatures involves extended exposure, i.e., for days or weeks.  *See, e.g., Burgess v. Whorton*, 3:08-cv-0437-RCJ (RAM), 2010 WL 3257904, at *2-3 (D. Nev. July 28, 2010) (42 days without air conditioning in cells when temperatures reached into the 90s and 100s may be sufficiently serious deprivation); *Paxton v. Idaho Dep't of Corr.*, 1:12-cv-0136-REB, 2014 WL 354697, at * 7 (D. Idaho Jan. 31, 2014) (where 80-year old sickly inmate was exposed to freezing cold winter breezes for several hours every day, due to open doors and windows in the unit, there was genuine dispute whether deprivation was sufficiently serious under Eighth Amendment).  Even in a case finding that extremely hot conditions in a transport van constituted a sufficiently serious deprivation, the duration of the prisoner's exposure was almost a week.  *Pitcher v. Wackenhut Corp.*, 3:05-CV-0499-JCM VPC, 2007 WL 2695407, at *2, 6 (D. Nev. Sept. 12, 2007) (during 6-day transport from New York to Nevada, lack of air-conditioning in the inmate transport area with temperatures over 100 degrees and bathroom stops just once a day amounted to conditions sufficiently serious to meet the objective prong of the deliberate-indifference test).

Here, Vensor's exposure to hot temperatures during transport totaled two hours—one hour each way to and from the MMC (*see* Doc. 130, Vensor Decl. ¶ 11).[2]  Vensor states that while in the van, he did not have access to water (Doc. 117, Ex. C, Vensor Dep. 109:25-110:1 (Doc. 117-1 at 12)).  The Court nonetheless finds that, despite the extreme temperatures that day, two one-hour transports without air conditioning do not rise to an objectively sufficiently serious deprivation under the Eighth Amendment.  *See Gerst v. Arpaio*, CV-12-01353-PHX-RCB (JFM), 2012 WL 3228838, at 4 (D.Ariz. Aug. 6, 2012) (denial of air conditioning, water, and use of bathroom for three hours

---

[2] The Court notes that the distance between CACF and the MMC is 63 miles, and the travel time is approximately 1 hour and 3 minutes.  *See* Google Maps, https://www.google.com/maps/dir/Maricopa+Integrated+Health+System,+2601+E+Roosevelt+St,+Phoenix,+AZ+85008/Central+Arizona+Correctional+Facility,+1401+E+Diversion+Dam+Rd,+Florence,+AZ+85132/@33.2316713,111.959345,10z/data=!4m13!4m12!1m5!1m1! (last visited July 9, 2014).

1   constitutes a temporary inconvenience, not a sufficiently serious deprivation).  Because

2   Vensor cannot satisfy the deliberate-indifference objective prong, no further analysis is

3   needed, and Velasquez and Cervantes are entitled to summary judgment.

4                    **2. Subjective Prong**

5            Even assuming that Vensor could show a sufficiently serious deprivation, he

6   cannot establish that Velasquez and Cervantes were aware of a substantial risk of serious

7   harm to Vensor's health or safety.  Vensor avers that he informed MMC medical staff of

8   the hot transport and that he felt ill, and they examined him and requested that the

9   officers allow Vensor to get a drink of water (Doc. 130, Vensor's Decl. ¶ 14).  The

10  medical staff did not provide any specific treatment in response to Vensor's heat-related

11  complaints, nor did they advise Defendants that Vensor could not be transported or

12  exposed to hot temperatures.  In short, there are no allegations or evidence that

13  Defendants were notified by the medical providers—who had just examined Vensor and

14  were informed of his complaint about the hot transport—that the heat posed a risk to

15  Vensor's health.  As Defendants assert in their motion, there is no reason Velasquez and

16  Cervantes—who were not medical personnel—should have assessed Vensor's medical

17  status differently (Doc. 118 at 5).   Moreover, pursuant to the medical providers'

18  recommendation, Defendants allowed Vensor to drink water before the return transport

19  (Doc. 130, Vensor Decl. ¶ 15).

20          On this record, there is no showing that Velasquez and Cervantes were aware of a

21  substantial risk to Vensor's health or safety or that they should have been aware of a risk

22  but refused to acknowledge facts known to them.  *See Farmer*, 511 U.S. at 837, 843 n. 8

23  (prison official cannot escape liability "if the evidence showed that he merely refused to

24  verify underlying facts that he strongly suspected to be true, or declined to confirm

25  inferences of risk that he strongly suspected to exist").  The Court will therefore grant

26  Velasquez and Cervantes' Motion for Summary Judgment.

27

28

9

1    **V.      Schell's Motion for Summary Judgment**

2            **A.      Governing Standard**

3            To succeed on a medical-care claim under the Eighth Amendment, a prisoner must

4    demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d

5    1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).   As

6    discussed above with respect to Vensor's conditions-of-confinement claim, there are two

7    prongs in the deliberate-indifference analysis: an objective standard and a subjective

8    standard.   In the medical context, a prisoner must first show a "serious medical need."

9    *Jett*, 439 F.3d at 1096 (citations omitted).   A "'serious' medical need exists if the failure

10   to treat a prisoner's condition could result in further significant injury or the 'unnecessary

11   and wanton infliction of pain.'"   *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.

12   1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th

13   Cir. 1997) (en banc) (internal citation omitted).   Examples of indications that a prisoner

14   has a serious medical need include "[t]he existence of an injury that a reasonable doctor

15   or patient would find important and worthy of comment or treatment; the presence of a

16   medical condition that significantly affects an individual's daily activities; or the

17   existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

18           Second, a prisoner must show that the defendant's response to that need was

19   deliberately indifferent. *Jett*, 439 F.3d at 1096.   The state of mind required for deliberate

20   indifference is subjective recklessness; however, "the standard is 'less stringent in cases

21   involving a prisoner's medical needs . . . because the State's responsibility to provide

22   inmates with medical care ordinarily does not conflict with competing administrative

23   concerns.'"   *McGuckin*, 974 F.2d at 1060 (quotation omitted).   Whether a defendant had

24   requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder

25   may conclude that a defendant knew of a substantial risk based on the fact that the risk

26   was obvious. *Farmer*, 511 U.S. at 842.

27           "Prison officials are deliberately indifferent to a prisoner's serious medical needs

28   when they deny, delay, or intentionally interfere with medical treatment."   *Hallett v.*

10

1  *Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks

2  omitted).  Deliberate indifference may also be shown by the way in which prison officials

3  provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or

4  "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant

5  actually knew of a risk of harm." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir.

6  2003).  And deliberate indifference may be shown by a purposeful act or failure to

7  respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  But the

8  deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate

9  medical care or negligence in diagnosing or treating a medical condition does not support

10  an Eighth Amendment claim.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)

11  (citations omitted).  Further, a mere difference in medical opinion does not establish

12  deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

13  Finally, even if deliberate indifference is shown, to support an Eighth Amendment

14  claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at

15  1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing

16  medical treatment does not constitute Eighth Amendment violation unless delay was

17  harmful).

18  **B.    Relevant Facts**

19  The parties each submitted a separate Statement of Facts (Doc. 114, Schell

20  Statement of Facts (SSOF); Doc. 132 at 11-17, Vensor Statement of Facts (VSOF2)).[3]

21  The Court also considers Vensor's declaration (Doc. 130).[4]

22      [3]  Schell objects to VSOF2 on the grounds that for many of his opposition
23  statements, Vensor simply cites to a list of exhibits; he failed to submit any admissible
   evidence to support his opposition to certain SSOF; and he failed to identify any separate,
24  additional statements of fact in support of his response (Doc. 134 at 2).  Schell's general
   objection to VSOF2 is overruled.  The Court will consider only specific objections to
25  identified paragraphs within VSOF2 and to specifically cited attachments/evidence.  *See*
   *Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont.
26  Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to
   permit the Court to rule"); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 443 n. 24
27  (S.D.N.Y. 2012) ("unsupported objection in entirely conclusory fashion to the entire
   record is insufficient and thus denied").

28      [4]  Schell objects to the Court's consideration of Vensor's separately filed

11

In 2001, Vensor had a lipoma removed from his right chest area (SSOF 2).[5]  A few years later, a tumor growth appeared in the same area and began causing Vensor pain, for which he took pain medication (VSOF2 ¶ 3 (in part)).  On December 29, 2010, Vensor made his first request to have the large tumor surgically removed (*id.*; Doc. 130, Pl. Decl. ¶ 3).  This same date, Dr. Haleem documented that Vensor had a large right chest wall mass/growth, most likely a lipoma, and he made a referral to the MRC (Doc. 133, Ex. C, Schell's Aug. 11, 2011 Inmate Letter Resp. reviewing Vensor's medical history (Doc. 133 at 59)).[6]  On January 9, 2011, Vensor was evaluated again by Dr. Haleem for complaints of the growth on his right rib; at that time, Vensor's case was still up for review with the MRC (*id.*).

On February 18, 2011, Vensor was examined by Dr. Haleem, who informed Vensor that the MRC decided that there is no need to have the lipoma removed because it

_____

declaration on the ground that it is not referenced, and she objects to Vensor's separately filed exhibits on the ground that they are not attached to his response to Schell's Motion for Summary Judgment; rather, they are attached to his response to Velasquez and Cervantes' Motion for Summary Judgment (Doc. 134 at 2-3).  The Court will overrule Schell's objections.  The Court may consider any material in the record. Fed. R. Civ. P. 56(c)(3).  Vensor's declaration, filed contemporaneously with his response to Schell's motion, is sworn under penalty of perjury, is made on personal knowledge, and asserts facts that would be admissible in evidence; thus, it satisfies Rule 56 (*see* Doc. 130). Fed. R. Civ. P. 56(c)(4).  Vensor cites to the specific exhibits attached to Velasquez and Cervantes' motion on which he relies; thus, the exhibits will be considered to the extent that Vensor provides enough specificity where, within each exhibit, support for his assertion may be found.  *See Southern Cal. Gas Co.*, 336 F.3d at 889.  The Court also notes that, in light of Vensor's pro se status, it must avoid applying summary judgment rules strictly.  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988).

[5] A lipoma is an adipose tumor; a benign neoplasm of adipose tissue composed of fat cells.  Stedman's Medical Dictionary lipoma (27th ed. 2000).

[6] Schell objects to Vensor's exhibits A-O on the ground that they are not authenticated, contain hearsay, and are not true copies because Vensor or someone has altered the documents with handwritten notations and markings (Doc. 134 at 4-5).  To the extent that Schell objects to the August 3, 2011 Inmate Letter Response in Exhibit C, the objection is overruled.  First, Schell presents no specific objection to this document. *See* n. 3.  Second, the Inmate Letter Response is **Error! Main Document Only.**an ADC grievance document, which constitutes a business record and is self-authenticating.  *See* Fed. R. Civ. P. 803(6) (hearsay exception).  Finally, the Court does not consider any handwritten markings that may have been added by Vensor; it considers only the type written response authored by Schell (*see* Doc. 133 at 59).

is a benign condition (*id.*; Doc. 130, Pl. Decl. ¶ 4).  On March 4, 2011, Dr. Haleem evaluated Vensor, who again requested that the growth be removed (Doc. 133 at 59).

On March 10, 2011, Vensor had a surgical consult at the MMC with Dr. William Arnold, an oncologist, and Dr. Nicholas Harrel, a bone specialist (Doc. 130, Pl. Decl. ¶ 5; Doc. 133, Ex. C, Aug. 1, 2011 Inmate Letter (Doc. 133 at 55)).  Vensor states that the specialists told him he had to have the tumor surgically removed as soon as possible before it attached to his ribs (Doc. 130, Pl. Decl. ¶ 5).  On April 14, 2011, Vensor had a CT scan performed (*id.*; Doc. 133 at 59).  Vensor states that the tumor had attached to his ribs (Doc. 130, Pl. Decl. ¶ 5).[7]

On May 30, 2011, Vensor was evaluated by a nurse, at which time he inquired about removal of the tumor (Doc. 133 at 59).  The May 30, 2011 medical note documents the nurse's advisement that the physician has to review Vensor's case with the committee and they will let him know as soon as the review is done (Doc. 133, Ex. B (Doc. 133 at 57)).[8]

On June 3, 2011, Dr. Haleem conducted a chart review and requested that Vensor be scheduled to discuss tumor removal (Doc. 133 at 37, 59).  On July 27, 2011, Vensor was evaluated by Dr. Brooks, who ordered a surgical consult for the mass (*id.* at 59).

On August 2, 2011, the MRC approved surgery for removal of the mass (*id.*; Doc. 133 at 56, Ex. C, Sept. 6, 2011 Inmate Letter Resp. (Doc. 133 at 56)).  The surgery was scheduled for October 5, 2011 (Doc. 133, Ex. B, Referral form (Doc. 133 at 38)).

Vensor underwent surgery on October 5, 2011 (Doc. 130, Pl. Decl. ¶ 7 (in part)).

## C.   Discussion

### 1. Section 1983 Liability

Schell's first argument for summary judgment is that Vensor's § 1983 claim against her is improper because, at the relevant time, she was a private employee (Doc.

---

[7] Vensor does not cite to a copy of the CT scan report; however, Schell does not dispute his assertion that the tumor had attached to his ribs (*see* Doc. 130, Pl. Decl. ¶ 5).

[8] To the extent Schell objects to the medical records in Vensor's Exhibit B, her objection is overruled (Doc. 134 at 4-5).  *See* n. 6.

113 at 5).  Schell relies on the Supreme Court's decision in *Minneci v. Pollard*, which addressed whether a *Bivens* remedy[9] is available to "a federal prisoner seek[ing] damages from privately employed personnel working at a privately operated federal prison, where the conduct allegedly amounts to a violation of the Eighth Amendment, and where that conduct is of a kind that typically falls within the scope of traditional state tort law."  132 S. Ct. 617, 626 (2012).  The Supreme Court held that a *Bivens* remedy could not be implied in such a case, and the prisoner had to seek a remedy under state tort law.  *Id.*

Vensor is not a federal prisoner, and he has not brought a claim under *Bivens*.  The *Minneci* decision does not explicitly or implicitly indicate that it was meant to affect § 1983 cases, and Schell presents no legal authority or argument for extending *Minneci* to state prisoners' claims under § 1983.  The Ninth Circuit has not addressed whether *Minneci* would bar § 1983 claims like Vensor's, and, absent any such directive, this Court declines to find that it does.  *See Green v. Wexford Health Sources*, No. 12-CV-50130, 2013 WL 139883, at *5 (N.D.Ill. Jan.10, 2013) (plaintiff's claim against a § 1983 defendant not barred; "*Minneci* has absolutely no bearing on section 1983 cases, where Congress has already created a cause of action"); *Centaur v. Prisoner Transp. Servs. of Am.*, No. 1:12-CV-2626-TWT-LTW, 2012 WL 6803978, at *4 n. 4 (N.D.Ga. Nov.8, 2012) ("[a]s this is an action under § 1983 that does not involve federal officials or prisons, *Minneci* arguably does not apply"); *Alajemba v. Rutherford Cnty. Adult Det. Ctr.*, No. 3:11-0472, 2012 WL 1514878, at *4 (M.D.Tenn. May 1, 2012) (stating it is unclear whether *Minneci* would be extended to claims against private physicians under state contract and refusing to so extend it).

## 2.  Serious Medical Need

Turning to Vensor's Eighth Amendment medical care claim, Schell asserts that Vensor has failed to produce any evidence to show he suffered a serious medical need (Doc. 113 at 9).  But Vensor avers that he suffered significant pain, and it is undisputed

---

[9] *See Bivens vs. Six Unknown Agents*, 403 U.S. 388 (1971), in which the Supreme Court permitted a direct private right of action against federal government officials to redress constitutional violations.

1    that Vensor's condition was documented, he was regularly treated, he was sent to

2    specialists and had CT scans performed, and, ultimately, he underwent surgery for

3    removal of the tumor (Doc. 130, Pl. Decl. ¶ 3).  *See McGuckin*, 974 F.2d at 1059-60.

4         On this record, a jury could find that Vensor's condition constituted a serious

5    medical need.

6                          **3.  Deliberate Indifference**

7         With respect to the initial question on the deliberate-indifference prong—whether

8    Schell had the requisite knowledge of a substantial risk of harm—there is no argument

9    that she was unaware of Vensor's medical condition and request for surgery.  In her

10   declaration, Schell explains that at the relevant time, she served as the Health Services

11   Administrator/Facility Health Administrator (FHA) (Doc. 114, Ex. B, Schell Decl. ¶ 2

12   (Doc. 114-1 at 14)).  According to the ADC Health Services Technical Manual, the FHA

13   is responsible for ensuring that all requests to the MRC are accurate and complete (*id.*,

14   Ex. B-1 (Doc. 114-1 at 17)).  As stated, Dr. Haleem first made a surgical referral to the

15   MRC on Vensor's behalf on December 29, 2010 (Doc. 133 at 59).  When making all

16   inferences in Vensor's favor, as the Court must do on summary judgment, Schell would

17   have been aware of Vensor's serious medical need after this referral, as early as January

18   2011.  *See Anderson*, 477 U.S. at 255.

19        Next, the Court examines whether Schell's response to Vensor's serious medical

20   need was deliberately indifferent.   Schell maintains that she cannot be liable for

21   deliberate indifference because she was not responsible for the alleged delay in surgery

22   (Doc. 113 at 7).  Liability under a § 1983 claim arises "only upon a showing of personal

23   participation by the defendant."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989)

24   (citation omitted).  Therefore, Vensor must allege facts that show Schell was personally

25   involved in the deprivation of his civil rights.  *Barren v. Harrington*, 152 F.3d 1193, 1194

26   (9th Cir. 1998).  The personal-involvement inquiry "must be individualized and focus on

27   the duties and responsibilities of each individual defendant whose acts or omissions are

28   alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633

15

1    (9th Cir. 1998).

2           Schell's evidence demonstrates that although she is a registered nurse, she was not

3    acting as a nurse in relation to Vensor's request for medical services; rather, she was the

4    FHA (Doc. 114, Ex. B, Schell Decl. ¶¶ 2, 9).  According to the ADC Health Services

5    Technical Manual, the FHA is responsible for ensuring "that all requests for medical

6    services submitted to the [MRC] are accurate and complete," and the FHA does not

7    approve or deny medical requests for services (Doc. 114, Ex. B-1 (Doc. 114-1 at 17)).  In

8    her declaration, Schell avers that she did not have authority to recommend for or against

9    surgery, to approve or deny requests for medical services, or even to opine whether

10   surgeries were necessary (*id.*, Ex. B, Schell Decl. ¶¶ 5-6, 11).  She further avers that she

11   was not responsible for scheduling surgery for inmates, including Vensor's surgery (*id.*,

12   Ex. B, Schell Decl. ¶¶ 12-13).

13          With this evidence, Schell has demonstrated the absence of a genuine issue of

14   material fact as to whether she is liable for delaying Vensor's surgery.  The burden

15   therefore shifts to Vensor to come forward with evidence to establish that a material

16   factual dispute exits.  *See Celotex*, 477 U.S. at 323-24; *Anderson*, 477 U.S. at 248-49.

17          In response to Schell's claims that she did not have authority to approve, deny, or

18   schedule surgery, Vensor points to the September 6, 2011 Inmate Letter Response that

19   informed him an order for a biopsy was waiting for Schell's signature so that it could be

20   sent for approval (Doc. 132 at 3-4, citing Doc. 133, Ex. C (Doc. 133 at 56)).  He also

21   cites to the ADC Health Services Technical Manual, which states that the FHA is a

22   member of the MRC (Doc. 132 at 3-4, 7 citing Doc. 133, Ex. C (Doc. 133 at 133)).

23   Vensor contends that as an active member of the MRC, Schell had partial responsibilities

24   in approving or denying surgery (Doc. 132 at 7).  Finally, Vensor argues that even if

25   Schell's duties were limited to "ensuring accurate and complete information" was

26   provided with medical requests to the MRC, she must have failed in her duties because

27   the MRC denied and delayed his request for surgery (*id.* at 8).

28          Vensor's speculative assertion that Schell had some responsibility for approving or

16

denying surgery, unsupported by any factual material, is insufficient to defeat summary judgment.  *Taylor*, 880 F.2d at 1045; *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"). Indeed, the ADC Health Services Technical Manuel, on which both parties rely, specifically provides that "the FHA neither approves nor denies any requests for medical services" (Doc. 133 at 132).

Dr. Haleem made the first request for surgery on December 29, 2010, which the MRC denied in February 2011 (*see* Doc. 133 at 59).  Vensor fails to proffer any evidence that Schell had a role in this process beyond ensuring that information included with the request was accurate (*see* Doc. 114, Ex. B, Schell Decl. ¶ 15).

The record suggests that another request for surgery was made some time after Vensor's March 2011 appointment with two specialists, and the MRC approved the surgery request in August 2011 (Doc. 133 at 56).  As such, on September 6, 2011, when medical personnel were waiting for Schell's signature on an order for a biopsy, Vensor's surgery had already been approved.  Given that Vensor had surgery on October 5, 2011, any delay that may have resulted from Schell's failure to promptly sign an order for treatment in early September was insignificant.  Moreover, Vensor presents no specific facts regarding an alleged delay stemming from this September 2011 incident.  *See Celotex*, 477 U.S. at 324 (the nonmovant must "go beyond the pleadings" and designate "specific fact showing that there is a genuine issue for trial").

While, ideally, Vensor would have received surgery to remove his tumor sooner, there is no evidence that Schell was responsible for any undue delay in the MRC's approval of surgery or the scheduling of his surgery.  The Court therefore finds that Vensor has failed to create a material issue of fact that Schell was deliberately indifferent to his serious medical need, and her Motion for Summary Judgment will be granted.

**VI.   Klausner's Motion for Summary Judgment**

Vensor alleges that Klausner was deliberately indifferent to his serious medical

1    need; thus, the same Eighth Amendment standard discussed above is applied to this

2    claim.

3                A.       Relevant Facts

4           The relevant facts are derived from Klausner's Statement of Facts (KSOF) (Doc.

5    120),[10] Vensor's Statement of Facts (VSOF3) (Doc. 131 at 15-17),[11] and Vensor's

6    declaration (Doc. 130).

7           In July 2011, after waiting months for surgery, Vensor contacted Donna Leone

8    Hamm, and advocate with Middle Ground, a prisoners' rights organization (Doc. 130, Pl.

9    Decl. ¶ 6 (in part)[12]).   On July 30, 2011, Leone e-mailed Klausner about alleged

10   inadequate medical care for a growth on Vensor's ribs (id. (in part); KSOF ¶ 9).

11   Klausner responded by e-mail that same day and stated that she would look into the

12   matter quickly and be in touch and that she will ask health services to contact Vensor

13   about authorization to communicate with Leone about his medical care (KSOF ¶ 9).   On

14   August 5, 2011, Klausner e-mailed Leone and stated that without authorization, the

15   information she could provide was that she understood the growth to be benign but that

16   surgery to remove it has been approved and is being scheduled (Doc. 120,  Ex. 1, Attach.

17   B (Doc. 120-1 at 10)).

18          On August 17, 2011, Leone responded and stated that Vensor had not been

19   informed that the growth was benign; rather, he was told a biopsy would be performed

20   during surgery to make that determination (id. (Doc. 120-1 at 9)).   Klausner responded

21          [10] In her reply, Klausner asserts that KSOF should be deemed admitted on the
22   ground that Vensor fails to provide any admissible evidence to controvert KSOF (Doc.
     138 at 8-10).   Vensor's declaration and response set out disputes with many of KSOF;
23   thus, the Court will not deem KSOF admitted.  See Thomas, 611 F.3d at 1150; see also n.
     4.

24          [11] In his VSOF3 Vensor primarily states that he "opposes" asserted facts set out in
25   KSOF and then cites only to the Exhibits supporting his opposition without page numbers
     or other specific references.   As with the other summary judgment briefing, the Court has
26   reviewed Vensor's evidence but, to the extent support cannot be found for his opposition,
     it is due to his failure to properly cite the record.  See Fed. R. Civ. P. 56(c)(1).

27          [12] Klausner objects to part of ¶ 6 (Doc. 138 at 14).   The Court has relied only on
28   that portion of ¶ 6 that Klausner admits to or for which Vensor demonstrates personal
     knowledge; thus, the objection is moot.

that same day and informed Leone that she cannot really speak to Leone's questions because she is not a doctor and is just providing information conveyed to her (*id.*). Klausner stated that she will make sure someone speaks with Vensor to be sure he is informed (*id.*).

Leone e-mailed Klausner again on September 9, 2011, stating that Vensor has still not had the surgery and could Klausner verify whether it has been scheduled (*id.* (Doc. 120-1 at 14)). This message was resent September 18, 2011, after there was no response (*id.* (Doc. 120-1 at 13-14)). On September 20, 2011, Klausner responded and confirmed surgery was approved but they were waiting for word from the hospital for a date (*id.* (Doc. 120-1 at 13)). Leone replied that same day stating that the situation was unacceptable given that an oncologist told Vensor in April 2011 that he needed surgery (*id.*). Leone stated that she was going to send copies of their e-mail communications to legislators and others to show ADC's indifference to Vensor's serious medical need (*id.*).

Klausner responded on September 22, 2011, and informed Leone that there was a date set for surgery within the next two weeks (*id.* (Doc. 120-1 at 12-13)).

As mentioned, Vensor underwent surgery on October 5, 2011 (Doc. 130, Pl. Decl. ¶ 7 (in part)).

**B.    Discussion**

Klausner does not argue that Vensor's condition was not a serious medical need, and the Court has already determined that, based on the treatment and surgery provided for his condition, a jury could conclude this first prong was satisfied.

Klausner instead argues that there are no facts to indicate that she was deliberately indifferent to Vensor's medical needs (Doc. 119 at 5, 7-8). As mentioned, in determining whether Klausner is liable for a constitutional violation, the Court must focus on her specific duties and responsibilities. *Leer*, 844 F.2d at 633. Klausner's evidence establishes that at the relevant time she served as ADC General Counsel and provided legal services to the Director and ADC personnel (Doc. 120, Ex. 1, Klausner Decl. ¶ 2). She avers that she has no medical training and is not a medical professional (*id.* ¶ 4).

19

1   And she declares that all of the information she provided to Leone was relayed to her by

2   medical personnel; she did not have any firsthand knowledge of or involvement in

3   Vensor's medical treatment, nor did she have any involvement in scheduling Vensor's

4   surgery (*id.* ¶¶ 11-12).

5       Klausner also submits the declaration of Dr. Richard Rowe, Medical Program

6   Administrator/Manager, who explains that when there is a request for an inmate to see

7   medical providers outside of prison, the request is reviewed by the MRC, and, if

8   approved, it is forwarded to the Central Office Medical Review Board for final approval

9   (*id.*, Ex. 2, Rowe Decl. ¶¶ 1-12, 4).  Dr. Rowe states that upon approval by the Medical

10  Review Board, the medical request is returned to the complex Clinical Coordinator, who

11  then schedules the appointment (*id.* ¶ 4).  Dr. Rowe confirmed that Klausner did not hold

12  any position on the MRC or Medical Review Board, nor was she a Clinical Coordinator;

13  thus, she had no authority to authorize, deny, delay, or otherwise direct an inmate's

14  medical care (*id.* ¶¶ 6-7).

15      In response to this evidence, Vensor contends that Klausner "should have given

16  legal advice to other ADC employees . . . to grant, and send Plaintiff for surgery as soon

17  as possible, not over 7 months later" (Doc. 131 at 2, 5-6).  But he does not dispute that

18  Klausner had no medical training and was not a member of the medical staff or MRC—

19  the only ADC personnel authorized to make medical treatment decisions.  Contrary to

20  Vensor's contention, Klausner's requests to medical services to review his records is not

21  sufficient involvement to attach liability for any subsequent delays in treatment (*see* Doc.

22  131 at 7).

23      Further, although some medical staff may have known about Vensor's need for

24  surgery for 7 months, the undisputed facts show that Klausner was not notified of

25  Vensor's serious medical need until July 30, 2011, when Leone e-mailed her (Doc. 120,

26  Ex. 1, Klausner Decl. ¶ 9; Doc. 130, Pl. Decl. ¶ 6).  *See Farmer*, 511 U.S. at 837 (official

27  must be aware of facts showing that a substantial risk exists).  And the e-mail evidence

28  shows that Klausner responded immediately to Leone's request for information and

20

assistance. *See id.* at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

In sum, the Court finds that Klausner's evidence establishes she had no personal involvement in Vensor's treatment or in the scheduling of his surgery and Vensor fails to come forward with any evidence to establish a material factual dispute as to her liability. *See Rizzo v. Goode*, 423 U.S. 362, 373, 376-77 (1976) (a defendant cannot be held liable under § 1983 absent evidence of personal participation in the conduct that allegedly caused the constitutional deprivation).  The Court will grant Klausner's Motion for Summary Judgment on this basis, and it need not address her remaining arguments regarding qualified immunity and damages. Accordingly,

**IT IS ORDERED**:

(1) That the reference to the Magistrate Judge is **withdrawn** as to Schell's Motion for Summary Judgment (Doc. 113), Velasquez and Cervantes' Motion for Summary Judgment (Doc. 118), and Klausner's Motion for Summary Judgment (Doc. 119);

(2) That Schell's Motion for Summary Judgment (Doc. 113), Velasquez and Cervantes' Motion for Summary Judgment (Doc. 118), and Klausner's Motion for Summary Judgment (Doc. 119) are **granted;** and

(3) That the Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 16th day of July, 2014.

Honorable Steven P. Logan
United States District Judge

21